THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **WILBERT BRUNO, PEACHLYNN THOMAS, AND KENNAN THOMAS, INDIVIDUALLY AND ON BEHALF OF, LUCILLE BRUNO (D)** | * * * * * | **CIVIL ACTION NO.:** |
| | * | **SECTION:** |
| Plaintiffs | * * | **JUDGE:** |
| versus | * * | **MAGISTRATE:** |
| **UNITED STATES OF AMERICA** | * * | |
| Defendant | * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TO THE HONORABLE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF LOUISIANA AND THE JUDGES THEREOF:

## COMPLAINT

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs, Wilbert Bruno, Peachlynn Thomas, and Kennan Thomas, individually and on behalf of their deceased wife and mother, Lucille Bruno, who respectfully allege the following:

## I. PARTIES

1. Made Plaintiffs herein are:

    a. Wilbert Bruno, a person of the full age of majority, who is domiciled in the Parish of St. Landry, State of Louisiana, and who is the surviving spouse of Lucille Bruno;

    b. Peachlynn Thomas, a person of the full age of majority, who is domiciled in the Parish of St. Landry, State of Louisiana, and who is the surviving daughter of Lucille Bruno;

    c. Kennan Thomas, a person of the full age of majority, who is domiciled in the Parish of St. Landry, State of Louisiana, and who is the surviving son of Lucille Bruno.

2. Made Defendant herein is the United States of America.

## II. JURISDICTION AND VENUE

3. The Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and 28 U.S.C. § 1346(b), as this lawsuit arises under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq* and involves a case in which the United States is a party-defendant. The Court has jurisdiction over any and all Louisiana state law claims asserted herein pursuant to 28 U.S.C. § 1367, as said state law claims form part of the same case or controversy under Article III of the United States Constitution.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), for a substantial part of the events giving rise to this claim took place in Opelousas, Louisiana.

## III. FACTS

5. Southwest Primary Healthcare ["SPH"] is a federal healthcare facility that is owned and operated by the United States of America. Upon information and belief, the mission of SPH is "to deliver comprehensive quality healthcare services by improving the accessibility, availability, and acceptability of such services to the people within the service area," and to provide a continuum of care.

6. The United States of America is named as a Defendant herein as the owner and operator of SPH, and also, as the employer of the nursing and/or support staff of SPH, for Defendant is responsible for their acts of negligence or malpractice.

7. Upon information and belief, the United States of America, in operating SPH, has a duty

to supervise its employees and/or to assure that its employees are adequately educated and/or trained to perform their duties. Defendant also has a duty to provide appropriate staffing and medical care to its patients.

8. Debbie Vidrine is a healthcare provider, who, at all times pertinent herein, was an employee of the Defendant at Southwest Primary Healthcare and was acting within the course and scope of her employment with Defendant when she treated the decedent, Lucille Bruno.

9. Thirty-nine year old Lucille Bruno first presented to the Emergency Department of Opelousas General Hospital [OGH] on September 21, 2013 at 9:22 a.m., where she was seen by Dr. Robert Colligan and Nurse Brent Soileau. Although the Facesheet associated with that visit indicates that Ms. Bruno's admitting diagnosis was "sinus problem," Nurse Soileau's "Chief Complaints" noted are URI symptoms and "breast pain," and it was specifically documented that Ms. Bruno had complained of a right breast lump.

10. Similarly, Dr. Colligan's problem summary from Ms. Bruno's September 21, 2013 visit to OGH specifically notes "breast lump present" and "pain of breast" as "active" diagnoses/problems. Dr. Colligan's clinician's history documents a history of a breast lump "which changes in size, upper right breast." He noted that Ms. Bruno denied swelling of the affected breast and that she had no history of nipple discharge. He also noted that Ms. Bruno had no history of breast pathology and no family history of breast cancer.

11. Dr. Colligan's examination of Ms. Bruno's right breast on September 21, 2013 revealed a palpable mass approximately two centimeters. He noted that the edges were "indistinct" and that the mass was "firm" and "[f]ixed to the surrounding tissue." The mass was

tender to palpation, and Ms. Bruno stated that her breast was sore after the examination.

12. Dr. Colligan discharged Ms. Bruno at 10:09 (she spent less than an hour in the E.R. total) and instructed her to follow-up with a primary care provider of her choice (for she had none).  He also instructed her to return to the Emergency Department if she had "further concerns."

13. On October 30, 2013, Ms. Bruno presented to Southwest Primary Healthcare [SPH] at 5:29 p.m., for she had been instructed to follow-up with a primary care provider.  At that time, she was seen by an "Examiner" identified only as "Debbie Vidrine" in the certified medical record.

14. On October 30, 2013, Ms. Bruno's "chief complaint" was documented as "cyst above R breast."  Ms. Vidrine (who, upon information and belief, is a nurse practitioner [NP] employed by SPH) specifically documented that Ms. Bruno had a "cyst in right breast, checked by er doctor few wks ago."

15. NP Vidrine's "assessment" was documented as "Right tonsil erythematous with small postule, right breast with tender 12 o'clock position, size of a cumquat."

16. NP Vidrine's "Plan" indicated, "Order **postponed** for a breast ultrasound," although no reason was given for the postponement.  NP Vidrine also documented that Ms. Bruno should "**Follow-up prn and follow-up visit 6 month(s).**"  She further indicated that there would be a "Follow-up for re-examination **6 months**."

17. Under the column "Practice Management" in Ms. Bruno's certified medical record from SPH, Ms. Vidrine indicated that she had conducted a history and physical consisting of "low complexity decision-making."  ***Her chart is not signed by an attending physician, and there is no documentation to indicate that an attending physician ever reviewed the***

4

*chart, or NP Vidrine's plan of care at all*.

18. Because she continued to suffer anxiety concerning the lump in her right breast, and because SPH had not scheduled her for diagnostic examinations, Ms. Bruno once again presented to the Emergency Department of OGH on November 22, 2013.  Her first contact was with Nurse Christopher Daniel at 19:36, who assessed her chief complaints as recent onset ankle pain (two hours) and pain to the right breast, no length of time specified. Nurse Daniel triaged Ms. Bruno to non-urgent care.  In his nursing assessment under SKIN, he noted pain "over the right anterior chest wall and ribs," and documented that his examination "of the right anterior chest wall and ribs" revealed skin that was "hard to palpation."

19. Ms. Bruno was subsequently assessed by Dr. Robert Colligan, who documented a chief complaint of breast pain and a history of a breast lump being present for "several weeks."

20. Dr. Colligan's examination revealed:

> *No palpable axillary adenopathy.  Normal breast size and appearance on visual exam.  Exam of the right breast reveals a palpable mass approximately 3 cm superior aspect of breast in mid clavicular line. Normal nipples without discharge or inflammation. Irregular surface.  The edges are indistinct, firm mass.  Fixed to surrounding tissue.  Non tender to palpation.*
> *Patient getting ready to eat burgers and milkshake requesting strong pain medication for her breast pain.*

21. Ms. Bruno's DISCHARGE INSTRUCTIONS from the November 2013 ED visit state, in pertinent part as follows:

> *Breast Cyst*
>
> *Your exam shows you have a breast lump or cyst.  This is very common in women.  It is usually due to a benign condition called fibrocystic change.  These breast masses form under the influence of female hormones (estrogen and progesterone).  The changes are most often located in the upper, outer portion of the breast.  They*

5

> *are often more swollen painful and tender during the premenstrual period.*
> *The diagnosis of one of these lumps or cysts may depend on further diagnostic tests such as mammography... this is important since 1 woman in 9 will eventually develops breast cancer in her life.....*
> *ADDITIONAL INSTRUCTIONS / DISCHARGE SUMMARY*
>
> *11/22/2013, Robert Colligan, Ibuprofen 3 times a day as needed for pain. Warm compress each night to breast cyst for 5 minutes as needed for pain. Follow up with Family Doctor for further evaluation of breast pain.*
> *Chief Complaint: pain to right breast: Breast pain. Soft tissue injury to left ankle. Primary Diagnosis ankle joint painful to movement: Breast lump present. Pain of breast. Disposition notes: Patient states she is driving; Disposition decision is discharge. Condition at discharge-stable Arrange for a follow up by appointment with patients own Primary Care Provider.*

22. At the time of this OGH Emergency Room visit, Ms. Bruno still had no primary care physician, for when she presented to SPH, she had been seen by a nurse practitioner who "postponed" her diagnostic examinations for unknown reasons and told her to come back in **six months**.

23. In addition, according to Ms. Bruno and her surviving children, with whom she was in regular contact about the status of her health, she continued to contact SPH *via* telephone throughout the fall of 2013 and the Spring of 2014. SPH never scheduled her for a diagnostic evaluation of any kind.

24. Ms. Bruno returned to the Opelousas General ER on June 13, 2014, complaining of "sinus congestion and headache." The ER physician who treated her that day, Dr. Kondilo Skirlis-Zavala, wrote: "states that she has been having bad sinus congestion and that her head hurts and that she has a cyst on right breast that has been hurting her to [sic]." After a cursory physical examination, which did not include an examination of Ms. Bruno's breast or breast mass, Dr. Zavala diagnosed "congestion of nasal sinus."

6

Ms. Bruno received a shot of the steroid betamethasone (Celestone) and prescriptions for amoxicillin and tramadol (Ultram). Dr. Zavala's disposition/discharge instructions for sinusitis stated:

> Verbalizes understanding of need for follow-up and how to access follow-up care… Arrange for a follow-up appointment with patient's own Primary Care Provider. Please follow up with your Primary Care Physician/Specialist as advised by the Emergency Physician. If you have further concerns call your Primary Care Physician or return to the Emergency Department.

25. On July 18, 2014, Ms. Bruno saw Dr. Derek Metoyer at Metoyer Family Medical Center in Opelousas. Dr. Metoyer noted a right breast mass, with axillary adenopathy, and documented that Ms. Bruno reported the mass as having been "present for several months, at least since October 2013." Dr. Metoyer sent Ms. Bruno for immediate ultrasound and mammography. The examinations revealed a large suspicious mass in Ms. Bruno's right breast at 12 o'clock measuring 5.5 cm, and two other masses, at 3 and 8 o'clock, as well as numerous axillary nodes. The mammography clearly demonstrated disease progression from the examination performed by Dr. Colligan in September of 2013; as well as progression from the SPH visit of October 30, 2013 and the OGH visit of November 22, 2013.

26. An ultrasound-guided core biopsy of the right breast mass at 12 o'clock and right axilla fine needle aspiration on July 24, 2014 revealed crushed malignant cells consistent with carcinoma, and the FNA was indeterminate for malignancy. Ms. Bruno presented to the Tumor Board at University Hospital and Clinic in New Orleans on August 12, 2014, and it was decided that she needed additional biopsies for better evaluation. Ms. Bruno was to proceed with chemotherapy empirically followed by surgery and adjuvant radiotherapy. She was seen by the radiation oncologist to map her tumor location before

starting treatment. Dr. Frey noted a 12x7 cm fixed mass which was tender and hard. He recommended a sentinel node biopsy and excision of the mass at the 12 o'clock position. This was done on August 20, 2014, and 3 sentinel nodes were negative, and the right breast mass only showed fibrosis, sclerosing adenosis, and dilated ducts. A left IJ Mediport was placed, and Ms. Bruno was referred for PET Scan.

27. The PET Scan was performed on September 18, 2014 and found a hypermetabolic breast mass, supraclavicular internal mammary, and axillary lymph nodes, again suggesting malignancy.

28. On September 30, 2014, Ms. Bruno was admitted for right breast lumpectomy. Results from that procedure demonstrated high grade ductal carcinoma with extensive necrosis. Surgical margins were positive for invasive carcinoma. The histology report showed high grade triple HER negative disease.

29. Ms. Bruno remained five days post-op for intravenous antibiotics to treat the abscess and wound care and was discharged on October 3, 2014. On October 10, 2014, Dr. Soto examined the wound and spoke with Lafayette General Hospital to arrange for suture removal. Ms. Bruno was referred back to UHC for a plan of chemotherapy. The UHC tumor board met a second time on October 21, 2014 and discussed additional treatment planning. The tumor board agreed that Ms. Bruno had high grade triple negative disease. Ms. Bruno suffered a very complicated course, made much more difficult by the delay in diagnosis of her malignant disease.

30. Ms. Bruno tragically died of metastatic disease on December 7, 2016. Upon information and belief, her disease was treatable, and her death was caused, more likely than not, as a direct and/or proximate result of the Defendant's negligence.

## IV. COUNT ONE:  MEDICAL MALPRACTICE PURSUANT TO THE FEDERAL TORT CLAIMS ACT

31. Lucille Bruno's healthcare providers at Southwest Primary Healthcare, including but not limited to, Nurse Practitioner Debbie Vidrine, breached the standard of care, causing her to suffer severe physical and emotional pain and suffering that ultimately culminated in her death.  Accordingly, Defendant, the United States of America is liable to Plaintiffs, as the surviving heirs of Lucille Bruno, for medical malpractice under the Federal Tort Claims Act.

32. Defendant's breaches of the standard of care include, but are not limited to, the following:
    a. Failure to timely diagnose and/or treat Mrs. Bruno's malignant breast cancer;
    b. Failure to order diagnostic testing in response to Mrs. Bruno's complaint of a breast lump and/or breast pain;
    c. Failure to coordinate appropriate follow-up care and treatment; and/or
    d. Failure to supervise, train, or monitor the practice of Debbie Vidrine.

33. The decedent, Lucille Bruno, timely filed an administrative claim pursuant to the Federal Tort Claims Act on April 14, 2016, which was acknowledged on May 3, 2016. On February 6, 2017, Lucille Bruno, through undersigned counsel, received correspondence from the Department of Health & Human Services denying Lucille Bruno's administrative tort claim. Subsequent to the filing of Lucille Bruno's administrative claim, but prior to the denial of the claim, Lucille Bruno tragically died on December 7, 2016.

34. On April 10, 2017, following the denial of decedent's administrative tort claim, Plaintiffs,

as the surviving heirs of the decedent, filed a federal complaint in the United States District Court for the Western District of Louisiana. The complaint was later dismissed without prejudice on March 23, 2018, for the failure of plaintiffs to exhaust their administrative remedies before filing the lawsuit.

35. The surviving heirs of the decedent, Lucille Bruno, filed an administrative claim pursuant to the Federal Tort Claims Act on April 10, 2017, which was received on April 17, 2017 and acknowledged on July 10, 2017. Six months have lapsed from the date of filing of the administrative tort claim, making the second claim ripe and timely.

### V. COUNT TWO: SURVIVAL ACTION

36. As a result of the foregoing acts of negligence, Lucille Bruno suffered severe, painful, and permanently debilitating injuries and damages prior to her death. Said injuries and damages include, but are not limited to:

    a. Loss of physical capacity;

    b. Past pain and suffering;

    c. Emotional distress;

    d. Embarrassment and humiliation;

    e. Loss of enjoyment of life, including the inability to live independently;

    f. Past medical expenses;

    g. Custodial care;

    h. Loss of earning capacity and/or lost wages; and/or

    i. Loss of the chance of a better medical outcome (pled in the alternative to the above).

## VI. COUNT THREE: WRONGFUL DEATH

37. As a result of the foregoing acts of negligence, Plaintiffs, Wilbert Bruno, Peachlynn Thomas, and Kennan Thomas, sustained severe, painful, personal injuries and damage, for their wife and mother suffered severe and permanently debilitating injuries that ultimately culminated in her death as a direct and/or proximate result of Defendant's negligence. Said injuries and damages include, but are not limited to:

   a. Past and future pain and suffering;

   b. Emotional distress;

   c. Loss of love, society, and affection;

   d. Loss of enjoyment of life; and

   e. Expenses associated with the care of their wife and mother, including her premature funeral and burial.

## VII. PRAYER

**WHEREFORE**, Plaintiffs, Wilbert Bruno, Peachlynn Thomas, and Kennan Thomas, individually and on behalf of their deceased wife and mother, Lucille Bruno, pray that after due proceedings had, there be judgment rendered in their favor and against Defendant, and that they be awarded damages, with judicial interest from the date of the filing of their administrative claim until paid, plus all costs of these proceedings, and for all general and equitable relief allowable under the law.

Respectfully submitted,

**KARA HADICAN SAMUELS & ASSOCIATES, LLC**

By: */s/ Kara Hadican Samuels*
Kara Hadican Samuels (# 29234) (T.A.)
Tiffany A. Morales (#36594)
4004 Canal Street
New Orleans, Louisiana  70119
Telephone:  (504) 558-9478
Facsimile: (504) 558-9482
E-mail: kara@karasamuels.com
*Attorney for Plaintiffs*

**PLEASE SERVE:**

United States of America
Through the Honorable David J. Shulkin
Secretary of the Department of Veterans Affairs
810 Vermont Avenue N.W.
Washington, DC 20420

United States of America
Through U.S. Attorney General Jeff Sessions
Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

United States of America
Through the U.S. Attorney for the Western District of Louisiana
The Honorable David C. Joseph
Western District of Louisiana
U.S. Attorney's Office
300 Fannin Street, Suite 3201
Shreveport, LA  71101